## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.                                                     Crim. Action No. 22-403 (CRC)

DALE HUTTLE,

                Defendant.

### I.       Introduction

Mr. Huttle comes before this Court having pleaded guilty to one Count of Assault on a Federal Police Officer in violation of 18 U.S.C. 111(b). While there have been multiple delays in the proceeding, those delays have not been the result of any reluctance to accept responsibility for his actions, but rather have been the result of myriad of serious health issues that have necessitated additional time and most importantly a delay in the commencement of any period of incarceration that may be imposed. Because of Mr. Huttle's advanced age and the significant medical complications he faces, and for the reasons articulated below, the defense requests a non-custodial sentence that substitutes a significant period of home confinement for incarceration. While a variance is otherwise appropriate, we recognize that non-custodial sentence is a very significant variance from the sentencing guidelines and would not be making this request absent his medical situation.

## II.     Procedural History

In November of 2022, Dale Huttle and his nephew Matthew Huttle were charged with various offenses related to their presence at the US Capitol on January 6, 2021.  Dale Huttle was arrested on November 9, 2022, in the parking lot of his place of employment in Merrillville, Indiana.  Matthew Huttle was arrested on November 28, 2022, in Boise, Idaho.  Matthew Huttle entered a guilty plea to a misdemeanor charge of Entering and Remaining in a Restricted Building or Grounds and was sentenced to 6 months incarceration and 12 months of supervised release. Unlike Matthew, Dale Huttle has no criminal history. (Matthew had 14 criminal history points according to the government's sentencing memo in that case). But, Dale Huttle acknowledges that his case is more serious as they involve physical contact with an Officer. Dale Huttle has been fully compliant with the conditions of his release since his arrest.

Mr. Huttle has from the beginning acknowledged the wrongfulness of his conduct, although until he saw the videos he had no recollection of making contact with the officer with his flagpole. The proceedings were originally delayed to give counsel an opportunity to review the video evidence with Mr. Huttle, which presented significant issues because Mr. Huttle does not own a computer, nor does he have an email account. Thus, arrangements had to be made with the Federal Defender's officer in Indiana to ensure that all viewing of the evidence complied with the protective order.

On December 8, 2023, Mr. Huttle entered a guilty plea to Count 2 charging him with Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon in violation of 18 U.S.C. § 111(a)(1) and (b).

### III.   Grounds for Variance Related to the Sentencing Guidelines

**A. While the enhancements apply, the degree to which they dramatically increase his guideline range given the facts of the offense conduct warrant a variance.**

#### 1. Official Victim

With Mr. Huttle's agreement, a 6-level enhancement has been applied pursuant to U.S.S.G § 3A1.2 because the victim was a government official. Consideration of a variance is appropriate because that enhancement typically applies when there is an animus towards a government official. Mr. Huttle was not predisposed to be motivated by the officer's status but acted out of character as a result of the mob mentality that ensued causing any law-abiding Americans to act in ways they otherwise never would have.

The applicable guideline provides in part:

(Apply the greatest):

(a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of conviction was *motivated by such status*, increase by 3 levels;

(b) If *subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offense Against the Person),* increase by 6 levels.

In the commentary, the Commission explains in pertinent part that "motivated by such status," means that the offense of conviction was motivated by the fact that the victim was a government officer or employee. Id. cmt. n.3. Again, we do not dispute that the enhancement is appropriately applied here, as agreed to in the plea agreement, but note that because a 6-level increase is dramatic, and its application in this case over emphasizes the importance of the victim's status in the actions taken, a variance is warranted.

## 2. Use of a Dangerous Weapon

As noted in the sentencing disparity section the definition of a dangerous weapon has been less than uniformly applied in these cases, leading to sentencing disparities. In the statement of offense, Mr. Huttle acknowledged that he jabbed his flagpole at Officer A.D. and he does not retract that acknowledgement. However, similar and even far more egregious conduct has often led to 111(a) rather than 111(b) charges as noted below. *See e.g. United States v. Sargant*, 21-cr-258 (TFH); *United States v. Leffingwell*, 21-cr-5 (ABJ); *United States v. Wilson*, 21-cr-345 (RCL); *United States v. Creek*, 21-cr-645 (DLF); *United States v. Miller*, 21-cr-75 (RDM); *United States v. Mattice and Mault*, 21-cr-657); *United States v. Richardson*, 21-cr-721 (CKK); *United States v. Wilden*, 21-cr-423 (RC); *United States v. Neefe*, 21-cr-567 (RCL); *United States v. Smith*, 21-cr-567 (RCL*); United States v. Sandlin*, 21-cr-88 (DLF); *United States v. Hernandez*, 22-cr-42 (CRC); *United States v. Judd*, 21-cr-40 (TNM); *United States v. Michael Foy*, 21-cr-108 (TSC). (See description of offense conduct in Section IV. D. below.)

### 3.  Serious Bodily Injury

Mr. Huttle acknowledged in his plea agreement that serious bodily injury resulted (i.e., slipped disc followed by chiropractic treatment, per officer testimony). He acknowledges that he was complicit in the actions that caused injuries and he accepts responsibility for his actions. However, it is important to address the excessiveness of this enhancement when compared to other January 6th defendants, as well as to address the extent to which Mr. Huttle's actions caused "serious bodily injury" which adds five points to his sentencing guidelines and is defined in U.S.S.G 1B1.1 application note M as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."

Mr. Huttle makes no excuses for his conduct and does not seek to minimize the pain the Officer AD has endured. However, far more egregious conduct has often led to lower injury point enhancements in other similar cases. Many of the injured law enforcement officers from January 6th were brutally and savagely assaulted but did not sustain injuries which could be defined as "serious" based on the wording in the USSG guidelines. These defendants were given lower injury level enhancements than Mr. Huttle, even though many of them caused significant injury and engaged in conduct far more egregious.

One example is *Kaleb Dillard*, 23-cr-00049-JMC. Dillard grabbed an officer by the vest and slammed him onto the ground where the officer hit his head on the

marble floor inside the US Capitol building. This officer suffered vertigo and dizziness for three months following January 6th, but "could not attribute his head injury to any particular moment during the riot." Dillard pleaded guilty to the 111(a)(1), was given a two-point bodily injury enhancement, and was sentenced to 10 months incarceration. Of note, Dillard also used a metal object to smash the window of the east Rotunda door and was one of the first people to enter the building through the east side. He also shoved another officer away from the door which resulted in the mob flooding into the building.

Other examples include multiple defendants in *USA v. Sabol*, et al (21-cr-00035-RC) who assaulted MPD Officer B.M. by dragging him face-down out of the west side tunnel, pulling him down the concrete steps and then beating him with various objects including a flagpole and a stolen MPD baton. Fortunately for Officer B.M., and somewhat miraculously, he did not sustain "serious bodily injury." However, the defendants that assaulted him were given only a three-point bodily injury enhancement for this officer specifically (noting that some of the defendants received additional points because they assaulted and injured an additional officer).



Another example is *Daniel Gray* (21-cr-495-ABJ). According to the Government, Gray (a former martial arts teacher) physically engaged with multiple officers, causing a female officer to fall down a set of stairs, hitting her head and cracking her bicycle helmet. The Probation Office in this case concluded that Officer M.B. suffered "serious bodily injury" as she stated that she suffered from post-traumatic stress disorder and continued to receive physical therapy for a pinched nerve. However, Officer M.B.'s medical records were not obtained, and therefore the defendant was given only a three-point injury enhancement.  Daniel Gray pleaded guilty to two felony counts (1512 and 111a) and was sentenced to 30 months incarceration notwithstanding the Government recommendation of 51 months imprisonment.

Many officers were pushed, pulled, or forced to the ground by protestors on January 6th. Fortunately some of them sustained no injuries at all (or at least not by definition).  One example of this is defendant *Russell Taylor* (23-cr-29-APM) who pulled bike racks away from police, grabbed an officer by the vest and then pulled that officer forcefully over his body as they fell down the steps.  This was in fact the same location where the incident occurred with Mr. Huttle and the same stairs where Officer A.D. fell and sustained his injury just nine minutes later.  But the officer victim in Taylor's case sustained no injury and therefore the defendant received no additional points for injury (and no additional enhancements for dangerous weapon, since this defendant used his hands).  Taylor was given a

guideline range of only 27-33 months incarceration. He was sentenced to 12 months +1 day notwithstanding the Government recommendation of 30 months incarceration.



While it is no excuse and offers no solace to Officer A.D., the injuries he suffered were indirectly caused by Mr. Huttle and probably others that day as well. Officer. A.D. suffered his injury as a result of the impact of his body on the concrete steps when he fell while being poked by Mr. Huttle's flagpole. The "poke" itself did not cause the injury (Mr. Huttle's flagpole was not pointed or sharp. It was a dowel rod with a blunt end). Mr. Huttle's intention was not to force this officer to fall on the steps.  In fact, Officer A.D. relayed to the FBI that he lost his footing (not that he was knocked to the ground by the flagpole).

*"[A.D.] then lost his footing and fell on the steps while still being poked by the flag pole."*

*"[A.D.] advised he suffered a back injury when he fell on the steps on the west front."*

Again, while it does not excuse Mr. Huttle's actions, Officer A.D. also advised the FBI that he suffered a back injury two years prior to January 6th which required treatment.

> *"[A.D.] advised approximately two years before Jan 6, 2021, he suffered a different back injury while on duty. However, [A.D.] advised he got treatment and at the time of the Jan 6 incident, he was 100% and had little to no pain."*

Moreover, Officer A.D. suffered multiple other assaults on January 6th which may have contributed to his injuries. After the incident with Mr. Huttle, Officer A.D. continued to act heroically. He remained at the front lines for another 25 minutes and then defended the west tunnel entrance on the lower west terrace. According to his testimony, Officer A.D. didn't leave the Capitol until after midnight, and when he did, he continued working in DC until 3am on January 7th. He returned to work for his next shift just four hours later at 7am and finally saw a doctor a few days later when he had time.

Officer A.D. was interviewed by the FBI on March 22, 2023 which was more than four months after Mr. Huttle's arrest and over two years following January 6th, 2021. Officer A.D. had never been interviewed, provided testimony, or been contacted about January 6th, 2021. During his interview, he was shown various images and BWC footage of the 22 second incident with Mr. Huttle. He was also shown footage of an earlier incident for the purpose of identifying an unknown

subject who sprayed law enforcement with chemicals.  He was not shown footage of anything following the incident with Mr. Huttle.

What is not included in Officer A.D.'s testimony is the following[1]: At 2:27pm (21 minutes after the flagpole incident with Mr. Huttle), the crowd pushed forward in the final breach of the west front. Officer A.D. and others attempted to hold the line.  When other officers were pushing the crowd forward with their hands, Officer A.D. turned his back to the crowd and attempted to hold them off with his body. During this time, multiple protestors repeatedly and forcefully rammed into his back.  The following images are from nearby MPD officers' BWC:






---

[1] The 2:27pm incident was researched by defense. Screenshots are from BWC footage found in the Global Discovery database.

10

Officer A.D. continued holding the line, with both the front and back of his body for another three minutes. He then retreated from the front line and stood at the base of the staircase by himself where he crouched over several times with his hands on his knees.  The following image is from Officer A.D.'s own BWC:



Officer A.D. didn't recall the above-described assault, but he did relay to the FBI that he was additionally assaulted in the tunnel:

> *"[A.D.] advised he was in the tunnel area for a long time, and suffered repeated assaults by the protestors, to include being sprayed and hit with a fire extinguisher."*

Officer A.D.'s integrity is not in question.  It would be completely understandable if he (or any of the other brave men and women serving beside him) mistakenly pinpointed the time/cause of a particular injury after suffering multiple assaults throughout the day when being shown handpicked evidence by the FBI two years later when they were focused on Mr. Huttle.  Surely Officer A.D. answered

honestly and to the best of his ability. Surely he was truthful when he told the FBI that he experienced sharp pain when he fell on the steps during the incident with Mr. Huttle.  But he likely also felt sharp pain when protestors rammed into his back during the violent incident which occurred 21 minutes later. But it appears Officer A.D. was not asked about the second incident. He was not shown any video to help jog his memory.

Officer A.D. acted heroically on January 6th and he suffered a serious injury. Mr. Huttle recognizes that and acknowledged in his plea agreement his remorse for his conduct by not disputing that the adjustment to his guideline calculation is appropriate. The above points are made only to demonstrate that a variance would be appropriate.

Additional support for a non-custodial sentence would be the rationale behind the newly enacted 4C1.1 reduction for zero-point offenders. There is no dispute that Mr. Huttle is a zero-point offender. He was not given a reduction pursuant to this section of the guidelines because his crime included violence and resulted in serious bodily injury. While we maintained the right to argue this enhancement at the time of the plea before *Pulcifer* was decided (essentially holding that "and" means "or" in this context), it is difficult to maintain that position now. However, the rationale that underlies the provision supports a variance for similar reasons. The provision was enacted because significant research finds that zero-point offenders are unlikely to recidivate. The same applies in this case despite the actions taken by Mr. Huttle. A 73-year-old man with no criminal history is not likely under any

scenario to commit another offense. This offense was very serious and had very serious consequences, but it is not the measure of the man Mr. Huttle is.

Mr. Huttle stands by the plea agreement but submits that on the facts of his particular conduct, a variance would be appropriate. "[T]he punishment should fit the offender and not merely the crime," *Pepper v. United States*, 562 U.S. 476, 477 (2011). Thus, this Court should impose a sentence well below the guidelines. In light of his advanced age and serious medical situation, we respectfully request either a sentence of significant home incarceration or a short period of confinement at an appropriate medical facility.

## IV.   Application of the Sentencing Factors

### A. Mr. Huttle's history and characteristics demonstrate that a below guidelines sentence is appropriate.

#### 1.  Background and Family

Dale Robert Huttle, now 73 years of age, was born in East Chicago, Indiana to parents Arlene and William Huttle.  He is the sibling of one twin brother, Donald Huttle.  Dale and his brother endured a difficult childhood through no fault of their own.

Dale's father William passed away at the young age of 48 after suffering a heart attack when Dale and Donald were only four years old.  Dale and his twin were subsequently raised by a young window and single mother. Arlene, having no higher education and little job experience, worked menial jobs to support herself and her twin boys.  Arlene and the boys continued living in their apartment which

was inside a boarding house that was mostly otherwise occupied by workers of the nearby steel mills. Often, Arlene had to rely on the other tenants to provide childcare for the twins while she was at work. Despite working long hours, Arlene struggled to make ends meet. She was rarely able to buy new clothing for her sons, and she was often unable to provide adequate meals.

Despite the hardships, Dale's mother made a point to attend church with her sons every Sunday. She enrolled them in Cub Scouts and Boy Scouts, and she ensured they had opportunities to participate in school sports.  Dale began supporting himself financially at age 13. He started mowing lawns, running a paper route, selling greeting cards, and even diving for golf balls at the city golf course where he'd then sell them back to the pro shop for five cents apiece.

Dale graduated from high school in 1969 with good grades. He began working at the Steel Mill and sent a portion of his paychecks to his mother.  Dale then attended the American Academy of Art in Chicago, Illinois where he studied commercial art for six months. He withdrew when his then girlfriend became pregnant with their first child.

Dale lost his mother to congestive heart failure in 1988 when she was 77 years old.

Dale has been married and divorced twice.  He is blessed with three biological children of his own, (Erica and Christie from his first marriage; and Eric from his second marriage) as well as a fourth child (Megan) who is the biological daughter of

his second wife, but whom Dale has raised since she was three and considers to be his own. In her letter to the Court, Megan writes, "Dale stepped up to the plate as a father to me when my biological father no longer wanted that responsibility… He taught me how to ride a bike, to play sports, to fish and many other things a little girl would like to do with her dad."[2]

Dale has always had, and continues to have, close relationships with all four of his children as well as with both of his ex-wives. Dale is extremely proud of his children. None of them have ever been in trouble with the law; all are upstanding citizens. Both Christie and Megan are nurses; Erica is a paralegal; and Eric, a Teamster, is currently studying to be a pilot. Dale considers his children to be his life's greatest achievements, and they likewise contribute their achievements to their father. Eric writes: ".. my father has been a source of love, guidance, and support for me and my siblings. His unconditional love and support have shaped us into the people we are today."[3] Erica writes: "His presence has been a source of strength and guidance for all of us."[4]

All three of Dale's daughters have children of their own. Dale is a grandfather to eight children and a great-grandfather to three.

---

[2] Letter from Megan Moore, as part of Exhibit A
[3] Letter from Eric Huttle, as part of Exhibit A
[4] Letter from Erica Huttle, as part of Exhibit A



*Mr. Huttle with his family*

Dale continues to reside in Lake County, Indiana, in a rented apartment that he shares with his Golden Retriever Dakota. He remains close with his family, including his twin brother who resides nearby in Hobart, Indiana. The two see each other often.  Dale values his family over everything.

### 1.  Mr. Huttle is dedicated to his church and his community.

Mr. Huttle joined his local church, The Family Christian Center, in 1988, the same year his mother passed away. Since then (for the past 36 years), he has been a dedicated member of the congregation as well as an active participant in volunteer community outreach programs led by the church.  Every Thanksgiving, the church holds a food drive for those in need.  Whenever Mr. Huttle's schedule allows, he assists with the food collection and has often been the lead volunteer for location

set-up and advertising. He instilled his values on his children by including them in volunteer work at the church.  His son Eric writes: "Some of my earliest memories with my father are going to church and participating in volunteer work.  Every thanksgiving we would go with my church to homeless shelters to cook and hand out food."

In 2005, during the aftermath of Hurricane Katrina, Mr. Huttle went to his local Red Cross to sign up as a volunteer.  Due to work schedule conflicts, he was unable to meet the required three-week commitment.   But feeling compelled to help in some way, he phoned his church and convinced them to allow him to use the church parking lot as a location for a disaster relief effort.  Mr. Huttle organized, advertised, and led the effort which resulted in 40 semi truckloads of community donated supplies which were then transported by members of his church to Mississippi and Louisiana.



*Articles from The Times (Munster Indiana) published on 9/5/2005 and 9/13/2005*

### 2. Mr. Huttle is a hard worker, a dedicated employee, and has a strong work ethic.

Mr. Huttle has always been a hard worker and dedicated employee.  His strong work ethic was instilled at a very early age when he began working odd jobs at age 13. This sense of dedication and commitment continues today at age 73.

Mr. Huttle spent the majority of his adult life working in the automobile industry. Prior to 2013, he worked as a salesman at various dealerships in Illinois, northwest Indiana, and Texas.

From 2013 through 2022, Mr. Huttle worked at O'Reilly Auto Parts as a delivery driver.  Unfortunately, his employment at O'Reilly was terminated due to his arrest in this case in 2022.  Mr. Huttle obtained new employment at NAPA Auto Parts within two weeks. He continues his employment at NAPA, earning $11/hr as a commercial driver on a 29-hour work week. He does not receive benefits.

### 3. Mr. Huttle has no criminal history

Aside from his arrest and subsequent guilty plea in this case before the Court, Mr. Huttle has always been a law-abiding citizen. His criminal history score is zero (establishing a criminal history category of I).  He has no prior criminal convictions (neither as an adult nor a juvenile). In his entire long life, Mr. Huttle has had nothing more than a couple of seatbelt violations. This in and of itself is a reason to vary from the guidelines as noted above.

## B. The nature and circumstances of the offense

### 1. Planning for January 6th, 2021

Following the 2020 Presidential election, former President Trump, members of his inner circle, and some members of the media began circulating the word that the election had been corrupt and had been "stolen."  As a republican and supporter of Trump, Mr. Huttle felt concerned.

During this time, and in the months following the November 2020 election, Mr. Huttle was receiving a large portion of his "news" from his Facebook newsfeed. After reading a few articles about the "stolen" election, Mr. Huttle's Facebook newsfeed became flooded with right wing media articles about election corruption Mr. Huttle, a 73-year-old blue-collar worker, is not tech savvy. He is not knowledgeable about the internet. He was not aware that Facebook and other social media platforms use machine-learning algorithms to individualize ads and to dictate content based on previous "clicks."[5] Mr. Huttle believed that the news he was reading was covering the general scope of mainstream media and that it was a representation of current events. From his viewpoint, the vast majority of the media agreed that the democratic process had been undermined by fraud.

To say that Mr. Huttle was skeptical of the election results, or even that he suspected voter fraud, would be an understatement.  In his mind, misinformed as

---

[5] New study shows just how Facebook's algorithm shapes politics : NPR

Frances Haugen says Facebook's algorithms are dangerous. Here's why. | MIT Technology Review

he was, Mr. Huttle was 100% sure that election fraud had occurred.  In fact, Mr. Huttle believed that most Americans (both democrats and republicans) also "knew" this to be true, but that Biden supporters were generally less inclined to speak up since the result had led to their preferred candidate being chosen.

When former President Trump started advertising the "Stop the Steal" rally, Mr. Huttle felt it was his patriotic duty as an American to support the President and to advocate against election fraud by attending the rally. He did not believe that his actions would change the election outcome, but he believed his presence was important. Mr. Huttle also knew that it would be his last opportunity to attend a Trump rally which he had never been to before. He was eager to visit DC for the very first time, to see the sights, and to visit the city's historical monuments.

On January 5th, 2021, Mr. Huttle drove from Crown Point, Indiana to Washington DC with his nephew (and co-defendant) Matthew Huttle and a 65 year old friend of Mr. Huttle's. They had no plans to meet anyone else in DC.  None of them were planning to protest at the Capitol building.  Their intent was to attend the rally at the Ellipse the following morning and then go sightseeing. They were not anticipating violence nor were they planning for violence. Mr. Huttle is not, and has never been, associated with any extremist groups.

When they arrived in Washington DC on the evening of January 5th, they checked into a hotel and then took a subway to the Ellipse so that they would understand how to arrive at the rally the following day. They had dinner and returned early to their hotel.

### 2. Actions on January 6th, 2021

#### a. Prior to Mr. Huttle's offense

Mr. Huttle, along with his friend and his nephew arrived at the Ellipse on the morning of January 6th and stayed for the entirety of Trump's speech.  They did not bring weapons or wear tactical gear as they were not planning or anticipating violence.  The American flag carried by Mr. Huttle was hung upside down on a flagpole.  The upside-down flag was not a sign of disrespect, but rather a symbol of distress, as Mr. Huttle believed our nation to be in distress at that time.  Although the flag was later used in the assault committed by Mr. Huttle, it was not intended to be used as a weapon and was not brought for that purpose.

Mr. Huttle recalls feeling an overwhelming sadness during the morning at the rally.  He believed that the Presidential election had been stolen which is something that he didn't think would ever happen in the country that he loved so much.  Mr. Huttle saw large groups of people leaving the rally before Trump's speech ended. He specifically remembers that he found these people to be incredibly rude and disrespectful to walk out in the middle of a speech.  He was unaware that these people were going to the Capitol building. Mr. Huttle recalls that many of them were wearing tactical gear.  He found this to be strange and slightly unsettling.  He recalls speaking to his friend about his concern, but in the end they agreed that the tactical gear was likely worn in anticipation of Antifa infiltrating the rally (which is something that Mr. Huttle and other rally attendees had been "warned" about).

While listening to Trump's speech, Mr. Huttle decided to join the crowd that was headed toward the Capitol building following the rally.  His original plan (to spend the afternoon sightseeing) changed after hearing President Trump's encouragement:  *"…we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them…I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard…. And after this, we're going to walk down, and I'll be there with you, we're going to walk down, we're going to walk down..…"*

While Mr. Huttle walked with the crowd to the Capitol, he imaged that they would be peacefully protesting on the lawn. He believed that President Trump would be there with them.  The PSR references a video, recorded by Mr. Huttle's nephew while walking to the Capitol, in which Matthew makes various statements, including, "We're going to see if we can get inside."  When Matthew spoke these words, he was narrating his video and was not speaking to Mr. Huttle.  There's no evidence to suggest that Mr. Huttle was part of this mindset or that he heard these words.  In fact, Matthew's video shows that Mr. Huttle was walking ahead of his nephew during the time these words were spoken and for more than two minutes after.



In this same video, when Matthew caught up to his uncle, he turned to him and asked him directly, "Hey, do you think we'll fill up the lawn here?" to which Mr. Huttle replied, "I'm sure." Filling up the lawn was Mr. Huttle's expectation. Entering the capitol building may have been Matthew's intention, but it was not the intent of Mr. Huttle.

It's true that later in this same video and when they got nearer to Capitol grounds, Mr. Huttle made a statement about "bum rushing" the capitol. At the time, and not yet even on capitol grounds (nor close enough to see that people were indeed rushing the building) he felt as though he was making a joke. Mr. Huttle realizes now that nothing about that statement was funny, especially considering his actions that followed.

As they neared Capitol Grounds and saw the size of the crowd, they chose a meeting place at the west side of the reflecting pool where Mr. Huttle's friend sat to rest. Matthew and Mr. Huttle entered capitol grounds at Garfield Circle at 1:53pm.

By this time, others had already removed barricades which indicated that this area was restricted.  After arriving on the west front and making their way closer to the front lines, Mr. Huttle did not see the peaceful protest that he had been expecting to see. At this point, he should have turned and walked away. But Mr. Huttle foolishly believed that his continued presence amongst the crowd was the patriotic thing to do.

Mr. Huttle observed law enforcement using tear gas on the crowd.  Although the use of tear gas and other non-lethal munitions by law enforcement was certainly justifiable, Mr. Huttle's judgement and reasoning had become clouded. Mr. Huttle has always been (and still is) a strong supporter of law enforcement. He has also been a patriotic supporter of our country and of democracy. Somewhere on the lawn of the US Capitol on January 6th, Mr. Huttle began to feel that law enforcement was not supporting democracy. In his misinformed mind, the police officers standing before him were aware that the election had been stolen and they were choosing to stand in the way of those who wished to make it known.

Mr. Huttle stood near the front line and observed others engaging with law enforcement. He eventually joined in and committed the crime which he has pleaded guilty to and for which he feels great remorse.

### b.  *Considerations of the offense*

Mr. Huttle knows that his actions are inexcusable, and he takes full responsibility for those actions. The following considerations are included to provide

the Court with an opportunity to understand the elements of the incident which lessen the egregiousness of the offense, not to contest his guilt.

*The flagpole was used to "poke" and "jab" which is less egregious than a "swing" and a "strike"*

Mr. Huttle did not swing his flagpole at law enforcement. He lowered the flagpole and poked it at law enforcement. Before being shown evidence of the event, Officer A.D. described the incident as follows (according to FBI notes in the 302):

> *"During the struggle for the bike rack, [A.D.] advised he saw a flagpole and felt the pole hit him and jab him in the stomach area." [A.D.] then lost his footing and fell on the steps while still being poked by the flag pole."*

After being shown images and videos of the event, Officer A.D. confirmed that the actions were poking and jabbing actions:

> *"[A.D.] recognized himself in the picture and the person holding the flag pole that was jabbing him.*
>
> *"[A.D.] recognized himself in the photo and advised in the photo was being jabbed with the pole and was using his OC spray."*

Mr. Huttle understands that he is guilty of assault, regardless of whether the action was a strike or a poke.  However, many January 6th defendants assaulted officers in a much more egregious manner, using forceful overhead strikes with various objects, and were charged with the same offense as Mr. Huttle or een the lesser offense as noted above.

*Length of the flagpole and distance between Mr. Huttle and Law Enforcement:*

The flagpole used by Mr. Huttle in the offense against Officer A.D. was 11 feet in length, which is significantly longer than a standard flagpole. Aside from

putting distance between Mr. Huttle and law enforcement, a flagpole of this length would have been much more difficult to control than a shorter object. Both the accuracy and the force would not have been as significant as if Mr. Huttle had used a smaller or shorter object or if he had been in closer proximity to the officers.



Furthermore, this distance between himself and law enforcement, as well as several protestors obscuring his view, meant that Mr. Huttle did not clearly see the details of what occurred on the other end of the flagpole. Mr. Huttle had also been indirectly exposed to tear gas which resulted in his vision being blurred.

Until he reviewed video evidence with counsel, Mr. Huttle did not realize that his flagpole had made contact with any officers. His recollection was that he propelled his flag in the direction of law enforcement, and contact was only made when they attempted to take it from him. After reviewing the evidence with counsel and seeing the event from the viewpoint of the officers' BWC, Mr. Huttle

now understands that he had indeed committed the crime to which he has pleaded guilty.

*At least one other individual contributed to the assault:*

Another man assisted Mr. Huttle for at least part of the incident by steadying the end of the flagpole.  Mr. Huttle does not wish to blame this other person, and he understands that he is the responsible party in this offense.  Counsel only wishes to point out that other people contributed. The image below shows both Mr. Huttle and the other [unidentified] man with their hands on the flagpole.



*The involvement of Officer E.F. was minimal and the charge was dismissed by the Government*

Mr. Huttle's involvement with the second officer (Officer E.F.) was minimal. This incident was Count 1 of the original indictment and was dismissed by the Government.  Paragraph 14 in the PSR reads as follows:

> *During the same incident, another officer – MPD Officer E.F. – was knocked to the ground as rioters pulled away the bike racks. As other officers attempted to pull Officer E.F. to his feet, the defendant forcibly jabbed his flagpole into and struck MPD Officer E.F. The defendant's flagpole made physical contact with Officer E.F.*

After careful review of the evidence, it appears that only the last sentence (that Mr. Huttle's flagpole made physical contact with the officer) is accurately worded. Officer E.F. slipped and fell down the steps (he was not "knocked to the ground" and he admits as much in his testimony) as he was running to the scene where bike racks were being pulled away by protestors near to Mr. Huttle's location. Other officers quickly reached down to grab Officer E.F. During the same time that Officer E.F. was being pulled back up the steps by other officers, Mr. Huttle had already began poking his flagpole toward the front line (above and to the left of Officer E.F.) This was not an overhead strike, nor was it a horizontal swing. It was a forward push which was not aimed at Officer E.F. Mr. Huttle was in fact poking his flagpole in the general direction of the front-line officers standing at the top of the steps who were spraying the crowd. As Officer E.F. was pulled up the steps by his colleagues, his helmet made very brief contact with Mr. Huttle's flagpole. The images below show the split second when Officer E.F.'s helmet brushed up against the pole as he was being pulled up the steps; and the following split second as the officer continued up the stairs.



Obviously, Mr. Huttle should never have propelled the flagpole forward in the first place. That action itself is inexcusable. Mr. Huttle only wishes to provide the Court with the full scope of this incident when considering his specific involvement with Officer E.F..

### c. Actions following the offense

Following the incident at 2:05pm, Mr. Huttle continued to stand at the front line where he and others attempted to [verbally] convince law enforcement to step aside. Mr. Huttle made comments about congress which were derogatory in nature, but he did not insult law enforcement.

At around 2:27pm, the crowd surged forward. Mr. Huttle tripped on a fallen barricade and fell to the ground where he was trampled by the crowd as they continued to rush forward. Mr. Huttle recalls losing consciousness. He is unaware of how long he lied face down on the pavement, but when he came to, he was disoriented and confused. He believes he suffered a concussion as a result of his head hitting the pavement.



The crowd continued pushing forward, causing the police line to move back and eventually reassemble at the base of a staircase leading up to the lower west terrace. Some officers retreated up the stairs and others remained and formed a new line. Mr. Huttle came forward from amidst the crowd and approached the new line at 2:35pm.  The PSR states the following:

> *"… the defendant approached Officer B.P. The defendant reached for Officer B.P.'s gas mask. The defendant then physically grabbed Officer B.P.'s baton and attempted to yank it away. The defendant yelled SURRENDER."*

Although the paragraph is factually accurate, the description alone (and the word "surrender" in all caps) implies that this incident was more egregious than it was. When Mr. Huttle approached the new line, he walked up. He did not rush the officers or approach aggressively.  Once at the front, Mr. Huttle used one hand (his non-dominant left hand) to reach in the direction of the officer's gasmask and then grasp the officer's baton. He did so while holding his own water bottle in his right hand. The officer easily pulled the baton away and out of Mr. Huttle's grasp. Mr.

Huttle did say the word "surrender." His voice was elevated when he said it, but to say that he "yelled" the word is debatable.  After releasing the baton, Mr. Huttle stepped back into the crowd and away from the front line.



Around four minutes later, at approximately 2:39pm, protestors breached the lower west terrace by advancing up the stairs on the southwest side near where Mr. Huttle had been standing. Once on the lower west terrace, protestors attempted to breach the "tunnel" where some of the most violent incidents of the day occurred. The fighting at the tunnel ensued for over two hours after this. Mr. Huttle did not participate in any part of this incident, nor did he stay to watch.  He walked back to where he had separated from his friend on the west side of the reflecting pool. After finding his friend, the two stayed in that general area and waited for Matthew to return. He never entered the capitol building which Matthew had done.

### 3.  Actions following January 6th, 2021

After returning to Indiana on January 7th, 2021, and in the months following, Mr. Huttle held firmly to his belief that the election had been stolen (and that most

people also "knew" this had occurred). However, he accepted that Joe Biden was President, and that nothing would change the outcome of the election. He settled back into his quiet and simple life feeling as though he had done his Patriotic duty by showing up at the rally and then at the Capitol on January 6th. He did not feel the need or the desire to protest further. He remained unaware that his actions had caused injury to a law enforcement officer.

Following his arrest in November of 2022, a reporter from Chanel 2 News followed Mr. Huttle to his home and questioned him about January 6th. Mr. Huttle stated many things that were true… that he never had a plan to go to the Capitol, only to attend the rally; that he never wanted to harm law enforcement; and that he felt he was invited to the Capitol by the President. He confirmed that he still held the belief that most people "knew" the election was corrupt: *We had a political hijacking… and I think everybody knows that.* When the reporter asked if he was sorry for his actions, Mr. Huttle, wishing to be seen as a loyal patriot, answered that he was not. However, at the time of the interview, Mr. Huttle was still unaware that he had caused injury to a law enforcement officer (Officer A.D. was not asked about the incident until four months following Mr. Huttle's arrest). He had not yet reviewed the video evidence which would show that his flagpole did indeed make contact with law enforcement. If he had been aware of the full scope of his role in the incident, he would not have made such a statement to the reporter. Mr. Huttle is indeed remorseful and saddened by his actions and the harm that he has caused.

### C. A sentence of home incarceration would be sufficient to reflect the seriousness of the offense and provide just punishment.

As this Court is aware, pursuant to U.S.S.G. §5H1.1 (age) and §5H1.4 (physical condition), the Court may depart from the guidelines where those factors distinguish that person from the "…typical cases covered by the guidelines." As the guideline states, "[a]ge may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."

Similarly, physical condition, which may be related to age, is also a basis for a downward departure. The guideline states: "An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." Here, while Mr. Huttle agreed not to seek a departure, the same rationale applies to a variance from the guidelines. Incarcerating Mr. Huttle at his age, with his serious health concerns, would unnecessarily create difficulties that could be avoided.

### 1. Mr. Huttle has a serious heart condition which requires ongoing medical interventions.

Mr. Huttle has a family history of serious and life-threatening heart conditions. Both of his parents had coronary artery disease. His father passed away at age 48 after suffering a heart attack; his mother died at age 77 from congestive heart failure.  Unfortunately, Mr. Huttle also has significant health concerns pertaining to his heart, including coronary artery disease which has led to serious

complications, additional diagnoses, and multiple surgeries which require ongoing medical attention. This condition was diagnosed after his participation in the events of January 6.

Mr. Huttle began experiencing concerns in the spring of 2023 when he was having shortness of breath and chest pains while mowing his grass. He underwent surgery to have a stent placed in the mid left circumflex Coronary Artery of his heart.  The procedure was called a Percutaneous Coronary Intervention [PCI]. The surgery was successful, but Mr. Huttle was advised that he had blockage of seven additional areas of the heart (including the right coronary artery), ranging from 15% to 50% stenosis (blockage) and would need continuous monitoring.  He was diagnosed with "two vessel disease," [EXH B, pp.1-2].

Two vessel disease is otherwise known as Multi Vessel Coronary Artery Disease [MVCAD], a more serious form of Coronary Artery Disease which affects multiple areas of the heart.  The condition develops when plaque builds up, causing a thickening or hardening of the arteries and is defined as any significant narrowing of at least 70% of two or more major coronary arteries. [6]

Mr. Huttle was prescribed medications and underwent rehabilitation following the initial procedure. His rehabilitation program consisted of heart monitoring during various forms of exercise, which he completed at the hospital twice per week. On November 20, 2023, less than six weeks following the surgery,

---

[6] Multivessel coronary artery disease: Symptoms, causes, and treatment (medicalnewstoday.com)

and while still in rehab, Mr. Huttle again began experiencing recurrent episodes of angina (extreme chest pain). [EXH B, p.4].

On January 3, 2024, Mr. Huttle was diagnosed with Chronic Total Occlusion [CTO] of the mid right coronary artery [EXH B., p.5]. CTO is a more serious condition than standard artery occlusion. It occurs when an artery becomes completely blocked (not just simply narrowed) and further increases the risk for heart attack and other serious heart problems.[7]

Mr. Huttle again underwent heart surgery, having three additional stents placed in his heart, this time on the right side.  A stent was placed in each of all three segments of the right coronary artery: the proximal segment, the mid segment, and the distal segment.  [EXH B., p.6].

Following the second surgery, Mr. Huttle again returned to rehab twice a week where he underwent testing and monitoring. Unfortunately, his symptoms returned.  On April 12, 2024, Mr. Huttle underwent his third angioplasty in which an additional stent was placed in the left coronary artery which had stenosis (blockage) of 90%. Post-op reports showed that Mr. Huttle also had narrowing of five additional areas of the heart, ranging from 20% to 40%, which would need to be monitored. [EXH B., pp.7-8] Mr. Huttle was told that further angioplasties and additional stents would be placed when stenosis reaches 70% in any of those areas (which is standard PCI practice.[8])

---

[7] Chronic Total Occlusion (CTO) > Fact Sheets > Yale Medicine
[8] PCI for heart disease: Risks, benefits, results, and more (medicalnewstoday.com)

Following the procedure, Mr. Huttle was discharged with the additional diagnoses of ischemic heart disease [IHD] [EXH B, p.9]. IHD is a result of Mr. Huttle's underlying condition (Multi Vessel Coronary Artery Disease). "Ischemia" refers to the reduction of heart function due to lack of blood flow and oxygen to the heart.[9]

Mr. Huttle now has a total of five stents in his heart: two in the left coronary artery, and three in the right coronary artery. He has stenosis in additional areas of his heart, which when last checked (on April 12, 2024) were up to 40%. He is currently still in rehab.

Mr. Huttle was prescribed various medications by his surgeon following his first surgery, including regimen clopidogrel 75mg (one tablet daily), metoprolol succinate 25mg (one tablet daily), aspirin, 81 mg (one tablet daily), rosuvastatin 20mg (one tablet daily, at night), and nitroglycerine for emergency situations. [EXH B., p.3; p.10]. He was instructed to carry the nitroglycerine with him at all times, as well as to keep it next to his bed at night. He is to take the nitroglycerine when he has extreme symptoms and/or believes he is suffering a heart attack. Since it was prescribed to him in 2023, Mr. Huttle has needed the nitroglycerine on two different occasions.

Mr. Huttle has follow-up appointments with his medical team in August and October and will complete his post-op rehab on October 26ᐧ 2024. At that time,

---

[9] Myocardial Ischemia: Causes, Symptoms and Treatment (clevelandclinic.org)

another scan will be scheduled to determine the amount of new blockage in his arteries. Further surgeries will then be scheduled as needed.

Unfortunately for Mr. Huttle, the stents in his heart are only interventions. They are not a cure for his disease. The interventions will remain ongoing for the rest of his life.  Continued rehab, strict adherence to medications, and regular doctor visits are of the utmost importance to Mr. Huttle's health and survival.

Mr. Huttle is unlikely to get quality healthcare in the BOP regardless of where he is designated. First, despite his fragile medical condition, Mr. Huttle will not be designated to a medical facility. See CRS IN FOCUS, Health Care for Federal Prisoners, August 26, 2020, available at Health Care for Federal Prisoners (congress.gov),  https://crsreports.congress.gov/product/pdf/IF/IF11629. He will likely be deemed at most in need of Care Level 2 as his heart failure is not yet considered "severe congestive heart failure," although that is likely on the horizon. Even that is just a Care Level 3.

Regardless of where he is designated, medical care in the BOP is sorely lacking as is a proper diet needed to sustain one's heart health. In an extensive investigation into health care in BOP custody

> NPR [] found stories of inmates at prisons all over the country going without needed medical care.  We found more than a dozen who waited months or even years for treatment, including people with symptoms that were obviously concerning - unexplained pain, bleeding, lesions, a lump that wasn't there before.[10]

---

[10] Transcript, *1 in 4 inmate deaths happens in the same federal prison. Why?* NPR (Sep. 23, 2023) (hereinafter, "Transcript, *1 in 4 inmate deaths happens in the same federal prison.*"), available at https://www.npr.org/transcripts/1200626103.

As one current medical staff member at FMC Butner described it, "

> So many inmates have told me, I complained about this lump, or I
> complained about this pain for so long, and they only gave me cream.  They
> only gave me Motrin.  They never sent me out for tests or anything.'[11]

And a February 2024 Justice Department Inspector General report on inmate

deaths in custody found that BOP employees do not always respond to medical

emergencies timely or use appropriate medical equipment.[12]

NPR's "investigation described a pipeline in which the BOP funnels the

seriously ill to a prison hospital like the one at Butner, where it is expected they'll

receive more intensive treatment.  However, NPR documented multiple examples of

substandard care there as well, including delays in treatment and mismanaged

medications."[13]  As Senator Dick Durbin (D-Ill.) explains

> "Simply transferring incarcerated adults to new facilities in the hope that
> they will receive care, without adequately addressing the dire staffing issues
> or fortifying facility medical units, is not a solution.'[14]

---

[11]  *Id.*

[12]  Jaclyn Diaz, *Lack of staffing led to 'deeply concerning' conditions at federal prison in Oregon*,
NPR, All Things Considered (May 22, 2024) (hereinafter, "Diaz, *Lack of Staffing*"), available at
https://www.npr.org/2024/05/22/1252764293/sheridan-prison-staff-issues-doj-inspection
(citing February 2024 report available at https://oig.justice.gov/reports/evaluation-issues-
surrounding-inmate-deaths-federal-bureau-prisons-institutions).

[13]  Meg Anderson, *Lawmakers push for federal prison oversight after reports of inadequate
medical care*, NPR (Dec. 12, 2023) (hereinafter, "Anderson, *Lawmakers push for federal
oversight after reports of inadequate medical care*"), available at
https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-
after-reports-of-inadequate-medical-.

[14]  *Id.*

Instead, Senator Durbin and Senator Chuck Grassley (R-Iowa), "[t]wo key senators on the committee tasked with overseeing the nation's federal prisons[,] are now urging the Bureau of Prisons to fix a medical care system that has allowed people in its care to die preventable deaths."[15]  Senator Grassley underscored his concern:

> 'I'm deeply alarmed by reports that the Bureau of Prisons has demonstrated foot dragging when it comes to providing medical care to those in its custody. BOP needs to be held responsible for this failure and take action to raise its standards.'[16]

But it cannot do so  at the current staffing levels.  Colette Peters, the BOP Director, recognizes this problem: "'Recruitment and retention of our employees remain a challenge.  . . . One of several pronounced areas of challenge is the hiring and retention of healthcare professionals.'"[17]  As Robert Hood, a former warden who worked at the BOP for more than two decades, explains, "'Clearly, the critical lack of staff impacts the safety and security of federal prisons.  Equally as important, the

---

[15] *Id.*

[16] *Id.*  Independent oversight is desperately needed in the BOP.  As Dr. Homer Venters, once the chief medical officer of New York City's jails, stated about the federal prison system, "My question is: Why do we have one of the nation's biggest health services not really being overseen by anybody outside of them?" Anderson, *Lawmakers push for federal oversight after reports of inadequate medical care*.  U.S. lawmakers are deeply alarmed, "specifically call[ing] for more independent supervision of the BOP, which operates with little transparency or oversight.  For instance, until NPR published its investigation [detailing numerous accounts of federal prisoners nationwide going without needed medical care], the bureau stated on its website that it was accredited by the Joint Commission, which accredits the vast majority of U.S. hospitals, when in fact its certification had lapsed two years prior.  The claim has since been deleted."  *Id.*

[17] *Id.*

healthcare for 160,000 federal inmates is under fire... What a terrible situation for many offenders with medical issues.'"[18]

"Staffing shortages, with corrections officers and medical personnel, are among the biggest obstacles facing the federal prison system," according to a recent report by the Justice Department's inspector general.[19] After a surprise inspection to FCI Sheridan, Inspector General Michael Horowitz explained,

> It's a problem that is at least 20 years in the making. It's not going to get fixed overnight. But what these inspections show us [is] how serious the problem has now become. It is deeply concerning when you go to a facility like Sheridan and you hear from the staff, correctional officers, health care workers, educators, that they can't do the jobs that they're there to do and they want to.[20]

The inspection revealed that there were not enough correctional officers to escort inmates to medical appointments outside the prison, leading to 101 canceled appointments in 11 months.[21] "And because there were not enough nurses or doctors at Sheridan, inmates weren't getting lab tests or X-rays done."[22]

---

[18] *Id.*

[19] Diaz, *Lack of Staffing.*

[20] *Id.*

[21] *Id.* A similar finding was made in March 2022, when the Inspector General issued a report stating, "'we found that the BOP faced challenges in transporting inmates to off-site appointments which resulted in a frequent need to reschedule appointments that could delay an inmate's healthcare'"; "'BOP also did not have a process in place to monitor how long an inmate waited to receive care after a cancelled appointment'"; and because it had no systems to monitor either issue, "'we believe it is difficult for the BOP to determine whether inmates are receiving care within the required community standard.'" Walter Pavlo, Federal Bureau Of Prisons' Medical Care Falls Short Of Its Own Policy, Forbes (Aug. 19, 2022), available at https://www.forbes.com/sites/walterpavlo/2022/04/19/federal-bureau-of-prisons-medical-care-falls-short-of-its-own-policy/?sh=c1cb70f5eab3.

[22] Diaz, *Lack of Staffing.*

As one experienced lawyer explained, "staffing matters because an inmate who needs to be seen by a provider or specialist out in the surrounding community, for example, requires more resources. 'What that entails is putting the prisoner in a transport vehicle, taking them into the community, bringing them into a hospital, with staff going along and being pulled away from their other responsibilities. So that is generally a pretty heavy lift just to get that level of attention.'"[23]   And it even affects other rehabilitative programming: "The issues revealed at Sheridan again emphasizes 'the cascading effects the lack of staffing has on all of the services,' Horowitz said. That includes [] the inability for the prison to offer mental health treatment, anger management classes, vocational training and other services to hundreds of inmates leaving them ill-prepared to leave prison fully rehabilitated[.]"[24]

These same issues plague non-medical facilities within the BOP, like the general low and minimum security portions of the Butner complex. Delshon Harding, president of the union representing Butner correctional officers, underscores: "'With the cuts to the staffing, we can't provide the security that is needed, we can't provide the medical treatment that is needed and the safety that's needed to fulfill the mission.'"[25]   Notably, "out of roughly 200 nurse and paramedic positions listed for the prison complex [at Butner], *more than 20% are currently*

---

[23]  Anderson, *1 in 4 inmate deaths happens in the same federal prison.*

[24]  Diaz, *Lack of Staffing.*

[25]  Anderson, *1 in 4 inmate deaths happens in the same federal prison*.

*vacant,* a fact the bureau confirmed to NPR."[26]  One family member described her son, who is at FMC Butner in the low security prison, waiting two years for a needed aortic valve replacement surgery.[27]  And "[w]hen medical emergencies happen at night, the potential outcome can be deadly.  Danielle Garner, vice president of the union and a correctional officer at Butner, told NPR that while Butner's federal medical center does have medical coverage on-site from 9 p.m. until 5 a.m., *the other three prisons and prison camp within the Butner Federal Correctional Complex do not.*"[28]  Garner "alerted NPR to two deaths last fall.  Both occurred at night, when medical care was not immediately available."[29]  In a letter to the BOP's mid-Atlantic regional director, Garner wrote: "'Staffing shortages and unsafe practices can no longer be accepted nor excused. Death is becoming the price paid for doing more with less at FCC Butner[.]'"[30]

These problems are not limited to Butner, which has long been held out as one of the examples of good care for those in need of Care Level 4. It permeates the entire BOP medical care. Federal prisons have struggled to provide adequate medical care, especially for those over 50 years old. *See, e.g.*, OIG, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016) (noting that almost 20 percent of the BOP's health services positions are vacant, contributing to

---

[26] *Id.*  (emphasis added).

[27] *Id.*

[28] *Id.* (emphasis added).

[29] *Id.*

[30] *Id.*

long waiting periods for care). Available at

https://oig.justice.gov/reports/2016/e1602.pdf.  The OIG found:

> recruitment and retention of medical professionals is a serious challenge for
> the BOP . . .  We further found that the BOP has not proactively identified
> and addressed its medical recruiting challenges in a systemic way. Rather, it
> has attempted in an uncoordinated fashion to react to local factors
> influencing medical recruiting at individual institutions. Moreover, we found
> that the BOP does not take full advantage of staffing flexibilities the PHS
> offers that could assist in addressing some of its most difficult medical
> staffing challenges.

Unfortunately, the OIG found that "many institutions remained understaffed, limiting the amount of car that an institution can provide." Id at 2. BOP's policy is that the vacancy rate of medical staff should not exceed ten percent. However, the OIG found that of the BOP's 121 institutions, only 24 met that criteria, and 12 had medical staff vacancy rates at "crisis level". Id at 1.

The OIG has also found that aging inmates (inmates age 50 and older) are costly to incarcerate, BOP institutions lack the staff and appropriate training to address the needs of the aging inmate population, the physical infrastructure of BOP institutions does not adequately house aging inmates, and the BOP has failed to provide programming opportunities addressing the needs of aging inmates. *See* OIG, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, at i-ii, 10, 16-17, 23-24, 30-31 (Rev. Feb. 2016), available at

https://oig.justice.gov/reports/2015/e1505.pdf.

And then there is the inhumanity of the way inmates are treated when they need medical attention:

When an inmate is prepared for surgery, they are still shackled—waist, hands, and legs. This is done regardless of their condition or their age. I need you, in other words, to imagine a hospital of elderly grandfathers and grandmothers, shackled to their beds. Now imagine this repeated throughout the country in the numerous medical facilities required to care for the prison system's aging population.

Shackling is particularly horrible for elderly inmates. For many, it is already a challenge merely to walk. After decades of poor or nonexistent medical care, many are now in the hospital because they have joints that are to the point of being just bone on bone. They live in a constant state of excruciating pain. And as they await joint replacement surgery, they are shackled. They can often barely move—but they are shackled. Seventy, eighty, even ninety years old, the sentiment seems to be: *If you wanted to be treated gingerly, then you shouldn't have come to prison.*

*See* [Graying in Prison - Wayne Pray - Inquest](https://inquest.org/graying-in-prison/), available at

[https://inquest.org/graying-in-prison/](https://inquest.org/graying-in-prison/).

## 2. Mr. Huttle is in the final chapter of his life

According to the CDC, the average life expectancy in the United States for males is 74.8 years. And that statistic does not separate out individuals with heart disease. The leading cause of death in both males and females is heart disease.[31]

Mr. Huttle's very serious heart condition already puts him at increased risk for both heart attack and heart failure.[32] The risk of heart attack is further increased by his age, his gender, his family history, and high blood pressure.[33] Furthermore, studies show that people 65 years and older are three times more likely to die from

---

[31] [FastStats - Deaths and Mortality (cdc.gov)](#)
[32] [Coronary artery disease - Symptoms and causes - Mayo Clinic](#)

[33] [Understand Your Risks to Prevent a Heart Attack | American Heart Association](#)

a heart attack compared to younger patients which increases the chance that a heart attack would be fatal in Mr. Huttle's case. [34]

At 73 years of age, and with the cards stacked against him, it's fair to say that Mr. Huttle is already living on borrowed time.  Regardless of whether or not he could receive the care he needs in a prison setting, any significant term of incarceration would be the equivalent of a life sentence.

### D. A sentence below what the government is seeking would avoid unwarranted disparities.

Eve setting aside the most important issue of Mr. Huttle's medical condition, a sentence below what the government has requested will promote respect for the law. Similarly situated January 6 cases have received considerably less in most, but not all, cases. A sampling of the most serious cases with similar conduct and/or charges follows:

### 1.  Below guidelines incarceration sentences

- *United States v. Adam Jackson,* 22-cr-230 (RC): Jackson pleaded guilty to assault on a police officer (111a) and was sentenced to 36 months of Probation with the special conditions of 12 months Home Detention and 52 weekends of Intermittent Confinement,[35] notwithstanding the Government recommendation of 41 months incarceration. Jackson hurled a large cone at officers, and then using a stolen police shield, and with a running start, he

---

[34] Heart Attack Survival Rate: How to Survive a Heart Attack (verywellhealth.com)

[35] ECF 86, Judgment as to Adam Lejay Jackson

rammed the frontline officers, causing two of them to fall.[36]

- *United States v. Bobby Russell,* 23-cr-29 (APM): discussed supra.

- *United States v. Grayson Sherrill,* 21-cr-282 (TSC): Sherrill violently swung and struck an officer with a metal pole. He then roamed around inside the US Capitol building for 34 minutes, joining others in chanting "NANCY." Sherrill was sentenced to seven months incarceration.  The government requested 41 months.[37]

- *United States v. Thomas Hamner,* 21-cr-689 (ABJ): Hamner was one of the first to breach the fencing around the Capitol perimeter. After wrestling barricades away from police on the west front, he assisted others in hurling a 10x10 Trump billboard at police.  Hamner pleaded guilty to assault on an officer using a dangerous weapon (111b) and was sentenced to 30 months incarceration, notwithstanding the Government recommendation of 84 months.[38]

- *United States v. Edward Rodriguez,* 21-cr-483 (DLF): Rodriguez pleaded guilty to assaulting officers with a dangerous weapon (111b). He was sentenced to 36 months incarceration when the Government requested 88 months. Rodriguez joined others in pushing against police on the west front and then spraying officers with bear spray, hitting at least one of them directly in the eyes and injuring at least eight officers with the chemical

---

[36] ECF 80, Government Sentencing Memo
[37] ECF 124, Government Sentencing memo
[38] ECF 28, Government Sentencing memo

irritant. Many of the officers required hospital care and recalled extreme
pain and injuries; some reported that the skin on their faces and hands
began to peel off.[39]

- *United States v. Matthew DaSilva,* 21-cr-564 (CJN): DaSilva was charged
  with assaulting police officers (111a) amongst other charges including Civil
  Disorder (231). He used his flagpole to block a door in an attempt to keep
  law enforcement from exiting the Capitol building. He then went to the
  tunnel where he remained for over 2.5 hours during which time he engaged
  in assault of front line officers and attempted to wrestle riot shields away
  from them. At trial, Officer J.S. recalled the pain he felt when DaSilva
  pushed against him. DaSilva's actions also caused another officer to lose
  balance, leaving him exposed to a flying desk drawer thrown by another
  rioter which hit him in the head. DaSilva was convicted of six counts in a
  bench trial. The Government recommended 52 months imprisonment, the
  midpoint of his guideline range. He was sentenced to 28 months.[40]

- *United States v. Brian Mock,* 21-cr-444 (JEB): Mock helped other rioters
  remove police barricades at the northern end of the West Plaza and
  committed four separate assaults against police officers. He pushed one
  officer to the ground and kicked or attempted to kick him. He threw a
  broken flagpole at another. He pushed a third officer in the back. Mock

---

[39] ECF 62, Government Sentencing memo
[40] ECF 111, Government Sentencing memo

shoved a fourth officer to the ground, using both hands and all of his body weight to do so, leaving the officer vulnerable to the mob. Mock then stole two USCP riot shields and passed them back to other rioters. Mock was convicted in a bench trial on all 11 counts, including the assaultive conduct. The Government recommended a sentence of 109 months. Mock was sentenced to 33 months.[41]

- *United States v. Daniel Gray,* 21-cr-495 (ABJ): Discussed supra.

- *United States v. Bruno Cua,* 21-cr-107 (RDM): Cua, armed with pepper spray and a stolen baton, attacked a police officer inside the US Capitol building who was attempting to lock the doors to the Senate gallery. After assaulting the officer, Cua then rushed into the gallery, jumped down to the Senate floor and sat in the Vice president's chair with his feet up on the desk. He then opened another door, allowing dozens of other rioters onto the floor. Cua then rifled through multiple desks belonging to US Senators but not before using his jacket to attempt cover the lens of a nearby surveillance camera. Cua was convicted of two felonies (111a and 1512) in a stipulated bench trial and was sentenced to 12 months +1 day. The Government had requested 57 months imprisonment.[42]

- *United States v. Kaleb Dillard,* 23-cr-49 (JMC): Discussed supra.

- *United States v. Nicholas Brockoff,* 21-cr-524 (CKK): Brockhoff threw an

---

[41] ECF 112, Government Sentencing memo
[42] ECF 328, Government Sentencing memo

unidentified item at police officers; assaulted multiple police officers in different locations using a fire extinguisher; obtained a police officer's helmet, wearing it throughout his afternoon rioting; entered the U.S. Capitol Building through a broken window that led to a Senate conference room; and once inside the building kicked in a door to gain entrance into a different, locked Senate conference room, which allowed others to enter the room as well; and rifled through belongings in the Senate taking home writing on a Senate notepad.[43] Brockoff pleaded guilty to assaulting officers using a dangerous weapon (111b) and was sentenced to 36 months incarceration as opposed to the Government recommendation of 51 months.

- *United States v. Sargent*, 21-cr-258 (TFH): Sargent pleaded guilty to assault on a police officer (111a) and civil disorder (231), among other charges, and was sentenced to **14 months** incarceration when the government requested 27 months. In addition to twice swinging at an officer, he recorded the scene on social media while boasting, "we got a clash of police going. . . Shit's getting fucking rowdy out here now. We got flash bangs."[44] After striking one officer, Sargent tried to strike another officer, but instead made contact with another protestor. At one point, that defendant bragged that he "duffed an officer in the face." He also told officers "fuck you guys, you guys are either with them or with us and repeatedly berated officers." After the

---

[43] ECF 55, Government Sentencing Memo
[44] ECF 70, Government Sentencing Memo

riot, he repeatedly gleefully bragged about punching an officer. After his arrest, he lied to the FBI about his actions.[45]

- *United States v. Leffingwell,* 21-cr-5 (ABJ): Leffingwell, a 57 year old veteran who entered the Capitol at the Senate wing doors and chanted at officers standing before him to "join us" and then, when two officers tried to repel him and the crowd around him, struck both officers in the head, landing three blows, pleaded guilty to assault (111a) and was sentenced to **six months** when the government sought 27 months.[46]

- *United States v. David Blair*, 21-cr-186 (PLF): Blair, who carried a large confederate flag and a backpack containing a knife and duct tape, and pushed a large lacrosse stick against a police officer's chest while yelling that he would not submit to commands, pleaded guilty to civil disorder (231) and was sentenced to five months.[47]

- *United States v. Robert Palmer,* 21-cr-328 (TSC): Palmer pleaded guilty to assault (111b) and was sentenced to 63 months after repeatedly assaulting police officers throwing a wooden plank like a spear, spraying officers with a fire extinguisher which he later threw at them, and then attacked again, with a piece of scaffolding and a second fire extinguisher as well as a traffic cone.  (His sentencing range was 63 to 78 months rather than 46 to 57 months because he lost his credit for acceptance of responsibility after

---

[45] *Id.*
[46] United States v. Leffingwell, 1:21CR5 (ABJ), ECF. No. 4.
[47] United States v. David Blair, 1:21CR186 (PLF), ECF. No. 55.

posting false narratives about January 6 on his fundraising website.)[48]

- *United States v. Devlyn Thompson*, 21-cr-461 (RCL): Thompson pleaded guilty to assault (111b) after exhorting officers to fight one on one, passing out riot shields to rioters encouraging them to use the shields as weapons against the officers, throwing a large box speaker at the police line, assaulting a police officer with a metal police baton, and remaining in the tunnel for more than 13 minutes. He was "among the first of the rioters to arrive on the inaugural stage and he was one of the last to leave." For these numerous assaults over an extended period, he was sentenced to 46 months when the government requested 48 months.[49]

- *United States v. Nicholas Languerand*, 21-cr-353 (JDB): Languerand, an individual who had prior assaultive and threatening conduct, pleaded guilty to assault (111b) after watching the violence for two hours before assaulting officers by throwing a piece of wood, a heavy black speaker, multiple sticks, and a large traffic cone, using a riot shield against the officers, and later bragging about and offering justifications for his violent acts, and was sentenced to 44 months when the government requested 51 months. Languerand also had an extensive arsenal when he was arrested, as well as writings deeply critical and menacing of the FBI and photos of the proud boys, three percenters, nazi iconography, etc. He posted that he had carried

---

[48] ECF 30, Government Sentencing Memorandum.

[49] ECF 30, Government Sentencing Memorandum.

a firearm with him to the Capitol although there was no evidence that this was true.[50]

- *United States v. Scott Fairlamb,* 21-cr-120 (RCL); Fairlamb pleaded guilty to assault (111b) and obstruction after entering the Senate Wing one minute after it was breached, screaming at the officers, armed with a police baton which he brandished. He shoved an officer and punched him in the face.  He shoved the officer so hard that he fell into a line of rioters, after which he stuck his finger in the officer's face and punched him in the face shield.[51] After January 6, he both lied about and bragged about his activities. He was sentenced to 41 months when the government requested 44 months.

- *United States v. Duke Wilson,* 21-cr-345 (RCL): Wilson pleaded guilty to obstruction (1512) and assault (111a) and was sentenced to 51 months. He physically engaged in hand to hand combat with officers at the Lower West Terrace, punching, shoving and kicking them as well as trying to steal their riot shields. He then picked up a several feet long PCV pipe and struck at the officers, striking at least two different officers, and threw it into the crowd of officers. Despite these actions, the government allowed Wilson to plead guilty to 111(a) which did not include holding him responsible for the assault with the PVC pipe as a dangerous weapon.[52]

- *United States v. Kevin Douglas Creek,* 21-cr-645 (DLF): Creek, a former

---

[50] ECF 34, Government Sentencing Memo
[51] ECF 50, Government Sentencing Memo
[52] ECF 29, Government Sentencing Memo

Marine who brought mace and a knife to the Capitol, pleaded guilty to assault (111a) after he pushed through the barricade and grabbed Officer JCM driving him back forcefully several feet, striking him in the face shield before letting him go (arguably a physical restraint) and shoved Officer RSE to the ground and kicked him. He also picked up a ratchet strap – a thick strap with heavy metal buckles and threw it at the officers.[53] He was sentenced to **27 months**, the government's request.

- *United States v. Matthew Miller*, 21-cr-75 (RDM): Miller pleaded guilty to assault (111a) and obstruction (1512) after he threw beer cans and batteries at officers, and unleashed the contents of a fire extinguisher on more than a dozen officers as other rioters were assaulting them (the same fire extinguisher later thrown at officers by Palmer). He was sentenced to 33 months.[54]

- *United States v. Greg Rubenacker,* 21-cr-193 (BAH): Rubenacker pleaded guilty without a plea agreement to all ten counts, including obstruction (1512), civil disorder (213) and assault (111a) among other charges, and was sentenced to 41 months. According to the government, he was one of the first people to enter the Capitol, entered a second time after leaving, chased Officer Goodman through the Capitol, berating him and other officers, swung a water bottle at one officer's head and threw liquid on another

---

[53] ECF 48, Government Sentencing Memo
[54] ECF 67, Government Sentencing Memo

officer.[55]

- *United States v. Alan Byerly* 21-cr-257 (RDM): Byerly was charged with
  assault (111b) for assaulting several officers with a taser, but pleaded guilty
  to assault (111a) and striking another person (113) for assaulting a
  reporter. According to the government, Byerly engaged in three separate
  assaults-- he activated a stun gun on one police officer and when it was
  taken by officers, he physically struck them and pushed against them,
  grabbing an officer's baton, he assaulted a group of officers using an
  enormous all metal Trump billboard with sharp edges that was capable of
  splitting someone's head open as a battering ram (hard to imagine this was
  less of a dangerous weapon than the flagpole used by Mr. Huttle), and
  viciously assaulted a member of the press, dragging him up and down the
  staircase. As the government described it, "Byerly grabbed the victim with
  both hands near the victim's shoulder and upper chest and pushed him
  backward. Byerly then pushed and dragged the victim past the site of the
  original altercation and towards a dense crowd. Byerly eventually placed
  both of his hands in the area of the victim's face and neck and continued to
  shove and push the victim away from the stairs, and toward a low stone
  wall that separated the stairs of the West Front of the Capitol Building
  from the west lawn below." This was arguably a restraint of the victim, but
  that enhancement was not sought. Nor was a weapon enhancement under

---

[55] ECF 56, Government Sentencing Memo

111b applied. The government requested a sentence of 46 months and he was sentenced to 34 months.[56]

- *United States v. Cody Mattice and James Mault,* 21-cr-657 (BAH): Mattice and Mault pleaded guilty to assault (111a) after planning and preparing for violence before coming to D.C., bring chemical spray and batons with them, pulling down a section of the bike rack fencing and leading the attack on the west plaza and later body-surfing over other rioters to enter the Lower West Terrace tunnel; both also used a chemical spray against the officers. Both Mault and Mattice lied about their actions that day with Mattice claiming that he was using the chemical spray against protesters in support of the police. Both avoided the 111(b) charge by being given the opportunity to plead to 111(a) despite their actions; each was sentenced to 44 months.[57]

- *United States v. Howard Richardson*, 21-cr-721 (CKK): Richardson bludgeoned a police officer three times with a long metal pole he brought to the Capitol, only stopping when it broke; less than 2 minutes later, he helped use an enormous metal Trump sign as a battering ram against police officers. He was sentenced to 46 months. There were however aggravating factors – he was on bail for illegal possession of a firearm on January 6; he made false representations to the Court during his plea hearing; and after his plea but before sentencing he was arrested again for

---

[56] ECF 46, Government Sentencing Memo
[57] ECF 60 and 61, Government Sentencing Memo

aggravated assault and lied to the local police about his conduct.[58]

- *United States v. Ricky Wilden,* 21-cr-423 (RC); Wilden, a member of the Proud Boys, assaulted numerous police officers with a chemical irritant while he wore goggles that he had brought with him and then threw the canister at the officers; he entered the Capitol. After January 6 he deleted Facebook messages and videos.[59]  He pleaded guilty to assault (111a) and the government sought 30 months. At the time of his sentencing, he had a pending charge for felony assault of his spouse with a deadly weapon and was using illegal substances while on release. Despite assaulting with a chemical irritant and the empty canister, he was not required to plead to the more serious assault charge and did not receive the dangerous weapon enhancement. He was sentenced to 24 months.

- *United States v. Marshall Neefe,* 21-cr-567-1 (RCL): Neefe pleaded guilty to obstruction (1512) and assault (111a) after he made plans to obstruct congress and then helped use the enormous metal Trump sign as a battering ram against police officers, then entered the Capitol building, pleaded guilty to assault (111a) and obstruction (1512). According to the government, prior to January 6, Neefe had shared his intention to bring weapons and commit violence. He admitted to making a wooden club with an American flag stapled to it to use as a potential weapon. The

---

[58] ECF 35, Government Sentencing Memo
[59] ECF 36, Government Sentencing Memo

Government requested sentence of 46 months (didn't include the weapon enhancement under 111b) and Neefe was sentenced to 41 months.[60] After the attacks, he celebrated his involvement.

- *United States v. Mark Mazza,* 21-736 (JEB): Mazza, a veteran, pleaded guilty to assault (111b) and CPWL after he brought two loaded handguns with him to the Capitol. While armed with one of his guns (he apparently lost the other in the crowd and it was subsequently recovered from another rioter who assaulted an officer), he pushed against the officers in the tunnel, berated and assaulted officers with a stolen police baton and remained armed on the Capitol grounds for several hours. "With his left hand, Mazza struck with full force against MPD Officer P.N.'s ungloved hand." He then showed off his stolen baton and engaged in the "heave-ho" pressure while brandishing the baton against police in the tunnel. After he left, he engaged in numerous acts of obstruction including filing a false police report about how he lost his gun, filing off the serial number of the stolen police baton, and providing false information to the capitol police.[61] The government sought a sentence of 78 months citing the egregiousness of his acts, and he was sentenced to 60 months.

- *United States v. Charles Bradford Smith,* 21-cr-567-2 (RCL): Smith pleaded guilty to obstruction (1512) and assault (111a). According to the

---

[60] ECF 84, Government Sentencing Memo
[61] ECF 30, Government Sentencing Memo.

government, he conspired with codefendant Neefe for two months to obstruct the certification of the election, planned and prepared for violence, and once there, assisted in hoisting the large metal Trump sign (described above) and used it as a battering ram assaulting at least three police officers; sentenced to 41 months when government sought 44 month sentence.[62]

- *United States v Sandlin,* 21-cr-88 (DLF) Sandlin pleaded guilty to assault (111a) and obstruction (1512k) and was sentenced to 63 months. According to the government, Sandlin with his coconspirators DeGrave and Colt, substantially planned for their participation, bringing a car full of weapons, including knives, bear spray and a pistol fully anticipating violence; Sandlin then directly assaulted at least 2 capitol police officers – attempting to rip off one officers helmet and taking a swing at another officer's head and assisted in the assault of at least 4 others, then, in the aftermath both celebrated his participation and tried to profit off of it and obstructed the investigation.[63]

- *United States v. Hernandez,* 22-cr-42 (CRC): Hernandez pleaded guilty to assault (111a) and civil disorder (231) after he climbed through the window at the Senate Wing Door, entered the speaker's conference room and senate gallery, he hit a door in the hallway with his flagpole, and attempted to

---

[62] ECF 90, Government Sentencing Memo.
[63] ECF 92, Government Sentencing Memo.

enter where congressional staff were barricaded in an office, he then assaulted a police officer with his flagpole by hitting him in the head.[64]  The dangerous weapon enhancement was not applied and he was sentenced by this Court to 24 months.

- *United States v. Douglas Jensen,* 21-cr-06 (TJK) was found guilty after trial before a jury of assault (111a), civil disorder (231) obstruction (1512) and other assorted misdemeanors and was sentenced to 60 months, after he entered the Capitol in the first wave and led a group of rioters menacingly chasing Officer Goodman towards the Senate Chamber, breached the Capitol a second time after exiting, and repeatedly riled up the crowd and threatened officers, while carrying a knife in his pocket. As officers tried to escort him out, he pushed and shoved them in a very agitated state.[65]

- *United States v. Philip Young,* 21-617 (DLF) Young pleaded guilty to all charges, including assault (111a) and civil disorder (231) without a plea agreement. The government requested a sentence of 40 months and he was sentenced to **8 months**. Early in the breach, Young rushed up the stairs, grabbed and lifted a barricade and pushed it into two MPD officers; after being forced back down the stairs, he pushed the barricade forward against the officers a second time. The government sought a dangerous weapon

---

[64] ECF 32, Government Sentencing Memo
[65] ECF 107, Government Sentencing Memo

enhancement for the bike rack, but it appears the Court did not agree.[66]

- *United States v. David Judd,* 21-cr-40 (TNM): Judd was found guilty after a stipulated trial of obstruction (1512) and assault (111a). According to the government, Judd was fully aware of the certification process, intended to disrupt the activities of Congress before coming to D.C., and "acted as an on-the-ground commander of other rioters, directing, encouraging, and instigating the violence, chaos, and destruction in and around the tunnel . . . yelling commands to organize rioters, passing items into the tunnel to be used as weapons" etc. He then joined in coordinated pushes against the police line and lit a firecracker and threw it at the police line.[67] The government characterized his conduct as "some of the most aggravating conduct that we've seen on January 6th."[68] The firecracker was found to be a dangerous weapon, and the Court found that Judd intended to cause bodily injury by throwing the firecracker, but the Court disagreed with the

---

[66] Counsel does not have access to the transcript and is making this assumption based upon the sentence ultimately imposed.

[67] ECF 527, Government Sentencing Memorandum.

[68] Transcript at p. 17. See also, Transcript at 26 (seeking a terrorism enhancement, the government represented 'the degree of his conduct was so great, and his intent was there so great, coupled with all of his other actions in the tunnel, which include directing the rioters, passing the shields in, passing the crutch in, telling people were to go, engaging in the heave-ho himself, this Defendant did it all, and he did it over the course of a long period of time."); Transcript at 53 ("looking at all of the January 6 rioters, I think this Defendant is at the high end of them also.)

guideline range of 78 to 97 months proposed by the government and probation and found a range of 37 to 46 months and then varied downward to impose a sentence of 32 months, finding the "advisory guideline produces an advisory sentence that is overly harsh."[69] The government requested a sentence of 90 months and he was sentenced to 32 months.

- *United States v. Lucas Denney,* 22-cr-70 (RDM) Denney pleaded guilty to assault (111b) without a plea agreement after deploying pepper spray at officers and assaulting them with a pole, brandishing a baton, and pushing a riot shield into officers and swinging at an officer who had become separated from the police line. He wore full battle attire and repeatedly confronted police officers, beginning at the West Plaza at the metal bike racks making multiple attempts to pull the barricades from the officers and kicking it into officers. Then, he sprayed pepper spray at the officers on multiple occasions and then threw his canister at the officers; he subsequently swung a long pole at another officer, launched a large tube toward other officers. He later joined the rioters at the Lower West Terrace carrying a baton or stick in his hands. Then, he swung his fist at Officer MK, grabbed him in an attempt to pull him down the stairs. After the attack, he lied to the FBI agents about his involvement and deleted information from a social media account. Denney was associated with the

---

[69] Transcript of Sentencing. The Court found the guideline range to be lower because of its reading of the 1512 guidelines.

Proud Boys and Three Percenters and before January 6 recruited people to his militia group and to participate in the events of January 6 which he expected to be violent. He specifically sought out people who would be willing to engage in violence to join him and solicited donations to pay for protective gear and pepper spray. According to the government, he sought out battles at BLM Plaza the night before the rally.[70] The government sought a sentence at the middle of the guideline range of 87 to 108 months (presumably 97 to 98 months) and he was sentenced to 52 months.[71]

### 2. Home Detention for Defendants with Special Circumstances

Many January 6th defendants have been sentenced to Home Detention. Often, this sentence has been imposed for individuals who have committed misdemeanors and was given in lieu of short terms of incarceration recommended by the Government.  However, there have been situations where Home Detention (or Home Incarceration) has been determined to be suitable for those with special circumstances even for those charged with felonies and/or facing lengthy periods of incarceration as recommended by the Government. Below are only some examples:

_United States v. Bennie Parker_, 21-cr-28-5 (APM):  Bennie Parker, age 73 years at time of sentencing, and with a serious medical condition (Psoriatic arthritis) was sentenced to 60 months of probation and six months Home Detention, notwithstanding the Government's recommendation of 78-97 months incarceration.

---

[70] ECF 46, Government Sentencing Memo.
[71] ECF 63, Government Supplemental Sentencing Memorandum.

The Honorable Judge Mehta attributed his decision to the defendant's serious medical condition, stating: *"I think the bottom line is quite evident to everyone here that Mr. Parker has serious medical needs that are better served in a non incarceral setting."*[72]

Bennie Parker was a member of the Oath Keeper's extremist group and was convicted of Conspiracy to Obstruct an Official Proceeding (1512). According to the Government, a critical component of the Oath Keepers' preparation for January 6 was to have an organized quick reaction force ("QRF"), comprised of individuals positioned with a cache of weapons, who could be summoned into the city if ordered by [Stuart] Rhodes.[73] The Parkers contributed to this organized effort by bringing two pistols and an AR-15 to DC and staying at the same hotel as the QRF in Arlington, VA. The Parkers arrived on capitol grounds wearing military fatigues, helmets and goggles.  While there, Bennie Parker spoke to the media and forecasted future violence by stating that "it will come to a civil war" and they were "willing to take up arms."

Although Bennie Parker's charges are different than Mr. Huttle's, they carry the same penalty, and in fact these two defendants have the exact same sentencing guideline range (78-97 months).  Similarly, both defendants had no prior convictions (both are category I) and both have serious medical conditions.

---

[72] Transcript of sentencing hearing
[73] ECF 1018, Government sentencing memo.

*United States v. Sandra Parker,* 21-cr-28-4 (APM): The Honorable Judge Mehta also showed leniency and compassion to Sandra Parker (Bennie Parker's 64 year old wife and primary caregiver) by sentencing her to 60 months probation and 12 months of Home Detention.  Sandra Parker, also an Oath Keeper, had also been convicted of the same charge as her husband, but was also convicted on four additional felony counts including Conspiracy to Defraud the United States, Destruction of Government Property. Obstructing Officers during Civil Disorder, and Conspiracy to Prevent Members of Congress from Discharging their Duties. The Government recommendation was 97-121 months incarceration.[74]

*United States v. Nicholas Rodean,* 21-cr-57 (TNM): Nicholas Rodean, a defendant with Asperger's syndrome, was sentenced to 240 days of Home Detention, notwithstanding the Government's recommendation of 57 months incarceration (the low end of his 57-71 months guideline range).  The Honorable Judge McFadden noted the defendant's medical condition at sentencing, stating: *"Ultimately, I believe the unique factors of this case and in particular your Asperger's diagnosis justify a noncustodial sentence..."*

According to the Government, Rodean smashed two windowpanes of the U.S. Capitol building with a flagpole and a metal object during the January 6, 2021 attack. To get to the building, he, together with other rioters, pushed through or past snow fencing, makeshift bike rack barriers, scaffolding, and even a police line on the west side of the building. Once inside, he and other rioters (some of whom

---

[74] ECF 77, Transcript of Sentencing Hearing

were yelling "where are they counting the votes?") pursued U.S. Capitol Police

Officer Eugene Goodman up the stairs to the hallway outside of the Senate

chamber. Outside of the Senate chamber, Rodean engaged in a stand-off with a line

of police officers.[75] Rodean was convicted of all seven counts including the 1361

felony charge (Destruction of Government Property) at a bench trial.

While each of these cases have very different facts, they demonstrate that the

sentence requested of the defense is not unreasonable given the specifics of this

case.

## V.      Conclusion

For all of the reasons noted above, the defense respectfully requests a non-

custodial sentence, or, in the alternative a sentence that includes only a short term

of incarceration followed by supervision with an extended period of home

confinement.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Michelle Peterson
Chief Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Shelli_Peterson@fd.org

---

[75] ECF 67, Government Sentencing Memo