**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-403 (CRC)** |
| **DALE HUTTLE,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Dale Huttle to 85 months of incarceration, three years of supervised release, restitution, and a $100 mandatory special assessment. The government's recommended sentence is the midpoint of the guideline range of 78-97 months, as calculated by the United States Probation Office and estimated by the parties in the plea agreement.

### I.    INTRODUCTION

On January 6, 2021, Dale Huttle, a 73-year-old commercial driver, viscously attacked multiple police officers with a dangerous weapon, severely injuring one of them. He was one of the more violent participants in the assault on the United States Capitol that day, which forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1]  As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States

1

Huttle joined the violent mob storming the U.S. Capitol on the Lower West Terrace where he witnessed violence breaking out around him between rioters and police officers. As rioters attacked the police line and attempted to break through the bike rack barriers, Huttle attacked. Using his flagpole as a weapon, Huttle forcefully jabbed his flagpole directly into several officers. As Huttle struck one officer, he caused the officer to slip down the stairs he was standing on, resulting in serious bodily injury to the officer.

Huttle's attack did not stop there. After the police line broke, Huttle charged towards other officers. As the officers attempted to escape from the mob, Huttle grabbed an officer's gas mask and attempted to steal his police baton. Throughout the day on January 6, Huttle berated and threatened officers, instructing them to back down and warning that the mob was going to "rush" the lawmakers inside the building for being traitors. After January 6, Huttle doubled down and expressed pride in his actions.

The government recommends that the Court sentence Huttle to 85 months of incarceration, which is within the advisory Guidelines' range of 78-97 months, for Huttle's conviction under 18 U.S.C. § 111(a)(1) and (b). An 85-month sentence reflects the severe gravity of Huttle's criminal conduct on January 6.

---

Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

II.     **FACTUAL BACKGROUND**

A.     <u>**The January 6, 2021 Attack on the Capitol**</u>

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 53 at ¶¶ 1-7, for a brief summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

B.     <u>**Dale Huttle's Role in the January 6, 2021 Attack on the Capitol**</u>

Huttle traveled to Washington, D.C. from Crown Point, Indiana to attend the "Stop the Steal" rally for former President Trump. ECF No. 53 at ¶ 8. After attending the rally, Huttle joined the crowd and marched to the U.S. Capitol. He was wearing khaki pants, a black jacket, a black baseball cap with an American flag logo, and a green and black scarf. He carried a long flagpole with an upside-down American flag attached. *Id.* at ¶ 9.



*Images 1 & 2: Screenshots of video footage showing Huttle walking to the Capitol on January 6, 2021 (Ex. 1[2])*

---

[2] References to "Ex." refer to the Exhibits submitted in support of the Government's sentencing

As Huttle marched towards the Capitol alongside his nephew/co-defendant, Matthew Huttle, Matthew Huttle declared, "we're going to see if we can get inside!" *Id.* As they got closer to Capitol grounds, Matthew Huttle said, "we're going to be stopped here, I don't think we're going to get close. We're going to have to go up the side . . . . Cops, a lot of cops." Huttle responded, "I think we ought to bum rush the Capitol building! Arrest them all. We've got enough people to do that." *Id.*; Ex. 1 at 4:40.

By 2:00 p.m., Huttle and Matthew Huttle arrived on restricted Capitol grounds alongside a large crowd that had assembled on the west front. ECF No. 53 at ¶ 10. Matthew Huttle used his cell phone to record the chaos around them. In the video, Matthew Huttle acknowledged the presence of tear gas in the air. Rioters around them chanted "USA USA USA!" As Huttle and his co-defendant faced the Capitol building, Matthew Huttle said, "some people just stormed it," and other rioters looking towards the Capitol repeatedly yelled "Breach it!" *Id.*; Ex. 2.

Huttle worked his way through the mob and approached a line of police officers standing behind bike racks connected to form a continuous barricade across the West Front of the Capitol grounds. ECF No. 53 at ¶ 11. Huttle and other rioters yelled at and berated the officers, saying, "You guys need to be patriots! Be Americans! Your country is being stolen!" and "You can't stop a million of us! We're taking this house, just so you know," and "didn't you take an oath? You're serving the enemy," and "how will you be able to sleep tonight?" and "Congress is a bunch of traitors at this point they stole our country from us!" *Id.*

---

memorandum, which will be made available to the Court.

While Huttle was at the front of the mob, rioters around him surged forward and pulled the bike rack barriers away from the officer line. As the officers struggled to maintain control of the bike racks, Huttle lunged forward towards the officers and forcibly jabbed his flagpole directly into Metropolitan Police Department (MPD) Officer A.D.'s stomach. ECF No. 53 at ¶¶ 12-13.



*Image 3: Photograph showing Huttle (red circle) attacking police officer (yellow oval) with a flagpole*





*Images 4 & 5: Screenshot of body worn camera footage showing Huttle jabbing his flagpole (yellow rectangle) into officers as other rioters forcibly pulled away the bike racks (Ex. 3)*

As a result of the jab, Officer A.D. lost his footing and fell backwards on the stairs as Huttle continued to strike him with the flagpole. ECF No. 53 at ¶ 13. As he fell, he suffered a sharp pain in his back and upper leg. *Id.* As a result of this assault, Officer A.D. slipped a disc in his back. *Id.* To this day, the officer still suffers from continued back pain and requires consistent medical treatment for his back. *Id.* Now on the ground at the foot of a vicious mob, Officer A.D. became fearful that he would be dragged into the crowd. He deployed his pepper spray towards the rioters in an effort to gain time to recover to his feet.

At the same time, MPD Officer E.F. continued to struggle over the bike rack barricade being pulled away by the crowd. As he attempted to maintain his hold of the bike rack, he slipped on the stairs. *Id.* at ¶ 14. When Officer E.F. attempted to regain his footing and balance, Huttle stepped forward and forcibly jabbed his flagpole at Officer E.F., striking him and causing him to fall all the way down the stairs. As other officers attempted to pull Officer E.F. to his feet, Huttle continued to jab the officers with the flagpole.



*Image 6: Photograph showing Huttle (red circle) attacking police officer (blue circle)
with a flagpole*



*Image 7: Screenshot of body worn camera footage showing Huttle yelling as he jabs a flagpole
(yellow rectangle) into officers (Ex. 9; see also Exs. 3, 8).*

After these assaults, the police line temporarily regained control of the situation. Huttle,

however, remained at the front of the police line and berated and taunted police officers. ECF No.

53 at ¶ 15. As violent confrontations continued, Huttle yelled the following at the embattled

officers:

- "Be patriots, be Americans! Your country is being stolen."
- "Look all the way back there, there's a million of us, you think you can stop us? You can't, you might as well just back off."
- "You're going to lose your country over this bullshit. Stop the [indecipherable] and let us do what we need to do. You can't stop a million of us."
- "It's going to get real ugly if you don't let us in man, it's going to get real ugly. We're coming in. We're coming in, okay. We don't want to hurt you guys, just step aside."
- "We're going to rush those mother fuckers in there!"
- "Congress is a bunch of traitors at this point, they stole our country from us."
- "I got pepper spray too."
- "You're already breached, just let us in. You're already breached."
- "It's going to get bad."
- "We're going to push you all forward in a minute."

*See id.*; Ex. 4.

After having actively defended their line on the West Front for over an hour, the officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters – Huttle included – directly in front of them. ECF No. 53 at ¶ 16. With their situation untenable, the officers attempted to retreat to safety as Huttle and his fellow rioters flooded the West Plaza.

Officers retreated towards a temporary staircase on the southwest side of West Front, which led to the Lower West Terrace. Huttle followed. At this point, the officers were in a precarious position – cornered with a wall at their back and an angry mob at their front. Their only escape was the narrow staircase. Some officers fended off rioters as other officers escaped up the staircase. Rioters threw objects at the now-cornered officers. Huttle approached these officers and continued his attack. *See id.*

8



*Image 8: Photograph showing police line (red rectangle)*
*caught between encroaching mob and wall*

Huttle reached, grabbed, and yanked Officer B.P.'s gas mask. *Id.*



*Image 9: Photograph showing Huttle (yellow rectangle) grabbing police officer's gas mask*

Then, as another rioter unloaded a large canister of chemical irritant at the officers' faces,

Huttle grabbed Officer B.P.'s baton and attempted to yank it away from him. *Id.*

9



*Image 10: Screenshot of body worn camera footage showing Huttle grabbing police officer's baton (Ex. 5)*



*Image 11: Screenshot of video footage showing Huttle (yellow square) as he faces the line of retreating officers and grabs police baton while another rioter sprays officers with a chemical irritant (Ex. 6)*

Huttle then grabbed another flagpole and stepped towards the officers.



*Image 12: Screenshot of body worn camera footage showing Huttle grabbing another flagpole as he moves toward the officers (Ex. 7)*

Fortunately, an officer successfully disarmed Huttle. Huttle continued yelling at the officers to "SURRENDER!" and "LEAVE!" *Id.*; Ex. 7.

Huttle and his co-defendant remained on Capitol grounds until after 5:00 p.m.

Huttle's web search history reveals that, in the months following January 6, he regularly tracked news regarding the Capitol riot, including arrests of rioters. After Huttle was arrested in November 2022, he gave a news media interview about his participation in the Capitol riot. There, he described the scene on the West Front as "mayhem" and filled with tear gas, smoke, flash bangs, and pepper spray. He declared, "I'm not ashamed of being there. It was our duty as patriots." He called himself "the ultimate patriot because I put myself on the line to defend the country. And I have, I have no regrets. I will not say I'm sorry." ECF No. 53 at ¶ 17.

## III.   THE CHARGES AND PLEA AGREEMENT

On December 14, 2022, a federal grand jury returned an Indictment charging Huttle with

eight counts:

1.   Count One, Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. §§ 111(a)(1) and (b);

2.   Count Two, Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. §§ 111(a)(1) and (b);

3.   Count Three, Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1);

4.   Count Four, Interfering with Law Enforcement Officers During a Civil Disorder, 18 U.S.C. § 231(a)(3);

5.   Count Five, Entering or Remaining in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A);

6.   Count Six, Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(2) and (b)(1)(A);

7.   Count Seven, Engaging in Physical Violence in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(4) and (b)(1)(A);

8.   Count Eight, Act of Physical Violence in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(F).

On December 8, 2023, Huttle pleaded guilty to Count Two. On Huttle's request, the Court

deferred acceptance of his plea until sentencing.[3]

_____

[3] Because Huttle pleaded guilty to an offense described in subparagraphs (A), (B), or (C) of 18 U.S.C. § 3142(f)(1), the Court was required to order the defendant detained pending sentencing pursuant to 18 U.S.C. § 3142(a)(2). At the time of the plea hearing, Huttle was undergoing treatment for a heart condition. As such, without objection, the defense requested that the Court delay acceptance of the plea until the sentencing date in order to allow the defendant to receive continued medical care from his physicians prior to sentencing.

## IV.    STATUTORY PENALTIES

Huttle now faces sentencing on one count of 18 U.S.C. § 111(b). The Presentence Report issued by the U.S. Probation Office accurately identifies the statutory maximum sentences for the count of conviction. PSR ¶ 5.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Probation Office made the following Guidelines calculations for Huttle's offense of conviction:

Count Two: 18 U.S.C. § 111(a)(1) and (b)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[4] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3)(B) | Serious Bodily Injury[5] +5 | |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under § 111(b) | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **31** |

| | |
|---|---|
| **Total Offense Level:** | **31** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |
| **Adjusted Offense Level:** | **28** |

---

[4] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[5] The Serious Bodily Injury here refers to the injuries suffered by Officer A.D.

PSR ¶¶ 41-53. That calculation is consistent with the parties' stipulations in their plea agreement. *See* ECF 52 at ¶ 5(A).

Recent amendments to the Sentencing Guidelines for 2023, which went into effect on November 1, 2023, include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 was not considered at the time the parties entered into the plea agreement. It does not impact Huttle's guidelines calculations.

Section 4C1.1 does not apply in this case because Huttle used violence when he violently jabbed several police officers with a flagpole, grabbed an officer's face mask, and attempted to disarm an officer of his baton. *See* U.S.S.G. § 4C1.1(a)(3) (providing that the adjustment for zero-point offenders applies only if "the defendant did not use violence or credible threats of violence in connection with the offense"). Section 4C1.1 does not apply in this case for the additional reason that Huttle possessed a dangerous weapon, that is, a flagpole, as acknowledged in his plea agreement. *See* U.S.S.G. § 4C1.1(a)(7) (providing that the adjustment for zero-point offenders only applies if "the defendant did not possess . . . [a] dangerous weapon (or induce another participant to do so) in connection with the offense"); Plea Agreement at 6-7 (ECF 52). Additionally, Huttle threatened violence as he stood at the front of the pack of rioters confronting police officers and yelling threats at them.

Judges in numerous January 6 cases have rejected the application of § 4C1.1 for defendants like Huttle who engaged in violence on that day. *E.g.*, *United States v. Wyatt*, 23-cr-215 (RDM); *United States v. Gundersen*, 21-cr-137 (RC); *United States v. Baquero*, 21-cr-702 (JEB); *United States v. Dillard*, 23-cr-49 (JMC).

14

The U.S. Probation Office calculated Huttle's criminal history as category I, which is not disputed. PSR ¶ 8. Accordingly, based on the applicable Guidelines range of 28, Huttle's Guidelines imprisonment range is 78 to 97 months of imprisonment. U.S.S.G., Ch. 5, Pt. 1 (Sentencing Table). Huttle's plea agreement contains an agreed-upon Guidelines range calculation that mirrors that calculation.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   <u>Nature and Circumstances of the Offense</u>

As shown in Section II(B) of this memorandum, Huttle's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power and throwing the United States into a Constitutional crisis. The nature and circumstances of Huttle's offense were of the utmost seriousness and fully support the government's recommended sentence of 85 months of incarceration.

### B.   <u>Huttle's History and Characteristics</u>

Huttle is reportedly employed as a commercial driver at NAPA Auto Parts in Indiana. PSR ¶ 75. He has been steadily employed for the last 40 years. PSR ¶ 75. Huttle has experienced health issues pertaining primarily to his heart. PSR ¶ 70.

### C.   <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law</u>

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Huttle assaulted multiple federal officers with a dangerous weapon when he

15

forcibly struck several officers with his flagpole. Huttle attacked as the officers were in an especially vulnerable position—at the top of a short staircase and attempting to fend off other rioters pulling away bike rack barricades. And, even after the officers retreated, Huttle followed and continued his attack. Huttle's belligerent criminal conduct on January 6 was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Huttle was the antithesis of a peaceful protestor on January 6, 2021. He willfully joined a violent mob storming the Capitol. He engaged in assaultive acts with a dangerous weapon against police officers carrying out their duties, he aided other rioters in doing the same, and he consistently berated police officers along the way.

Further, Huttle has yet to express any remorse regarding his conduct on January 6, 2021. To the contrary, after January 6 when he was interviewed by a local news station, Huttle maintained that it was his "duty" to be there and he put himself "on the line to defend the country."

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

He bragged that he had "no regrets. I will not say I'm sorry."

Huttle's failure to acknowledge the gravity of January 6, in addition to his public expression of pride in his actions, demonstrates that the sentence must be sufficient to deter Huttle from committing future crimes of violence in response to election results that he does not agree with.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the

need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("[A]s far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[8]

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, some salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Webster*, 21-cr-208 (APM), Judge Mehta sentenced the defendant to 120 months of incarceration following a trial. On January 6, Webster came to Washington, D.C. wearing a bulletproof vest and carrying a firearm on his body and a flagpole in his hand. Once on

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Capitol grounds, Webster spent eight minutes elbowing his way to the front of the crowd. At the front, Webster approached a police officer, pointed at him, and yelled demeaning remarks. Webster put his hand on the bike rack in front of him and forcefully pushed against the bike rack twice. Webster then used his flagpole to bash it against the bike rack near the officer line; Webster swung the flagpole with such force that it broke the metal pole in half. When the police line started to retreat, Webster charged forward and tackled an officer to the ground and attempted to rip off the officer's gas mask. This officer sustained several injuries as a result of Webster's attack. Webster made his way to the Lower West Terrace where he witnessed rioters drag MPD Officer Michael Fanone out of the tunnel.

Like Wesbter, Huttle carried a flagpole on January 6—Webster used his to threaten violence whereas Huttle used his as a weapon against officers. Both defendants violently assaulted police officers holding the line on the West Front—Huttle when he struck officers causing them to fall down the stairs and Webster when he tackled an officer to the ground. Both defendants attempted to disarm police officers—Webster by pulling on the bike racks and Huttle by yanking away an officer's baton. And both defendants attacked a police officer's face mask. Huttle's assaultive conduct caused more significant and long-lasting injuries to an officer than Webster's conduct. However, Webster brought a firearm to the Capitol which warranted a more significant sentence. Nevertheless, Webster's and Huttle's conduct on January 6 was largely comparable.

In *United States v. McCaughey*, 21-cr-40 (TNM), the defendant assaulted officers using a stolen Capitol Police shield in the Lower West Terrace tunnel. During one of his assaults, McCaughey used the shield to pin a police officer between the stolen police shield and a metal door frame, putting the officer in an incredibly dangerous position. As the officer was pinned,

another rioter ripped off the officer's face mask, stole his baton, and struck him in the head with the baton.

Judge McFadden sentenced McCaughey to 90 months of incarceration. Like McCaughey's attack, Huttle's attack against officers—including striking them with his flagpole and causing officers to slip down the stairs during a riot—similarly put the officers in precarious and dangerous positions. McCaughey's assaultive conduct caused one officer to suffer bodily injury. Huttle's assaultive conduct caused much more significant injuries, one of which has required continued medical treatment for years. Both defendants used a deadly or dangerous weapon during their attack, berated officers defending the Capitol, and have refused to display remorse for their actions. Applying the § 3553(a) factors, this Court should impose a comparable sentence for Huttle.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[9] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Huttle must pay $2,000 in restitution, which reflects in part the role Huttle played in the riot on January 6.[10] Plea Agreement at ¶ 12 (ECF No. 52). As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Huttle's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 100.

Additionally, the parties have agreed that Huttle will pay restitution to the victims who suffered bodily injury as a result of his conduct, which includes Officer A.D. *See* Plea Agreement at ¶ 12 (ECF No. 52). The government will file a supplement under seal pertaining to medical records relating to this additional requested restitution.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 85 months of incarceration, three years of supervised release, restitution, and a $100 special assessment.

---

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By:      */s/ Ashley Akers*
         ASHLEY AKERS
         MO Bar #69601
         Trial Attorney
         United States Attorney's Office
         601 D Street, N.W.
         Washington, DC 20530
         Phone: (202) 353-0521
         Email: Ashley.Akers@usdoj.gov